Case No. 15 cv 6408 (CS)

# UNITED STATES DISTRICT COURT

### FOR THE

### SOUTHERN DISTRICT OF NEW YORK

_____

### In re: Congregation Birchos Yosef

## BRIEF FOR DEBTOR-APPELLEE
## CONGREGATION BIRCHOS YOSEF

**Michael Levine, Esq.**
**Levine & Associates, P.C.**
*Attorneys for Debtor-Appellee*
**15 Barclay Road**
**Scarsdale, New York 10583**
**Telephone (914) 600-4288**

*Reproduced on Recycled Paper*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS .................................................................. 1

ARGUMENT

THE BANKRUPTCY COURT PROPERLY APPLIED THE SECTION
362(a) STAY TO THE *BEIS DIN* ARBITRATION COMMENCED BY
THE CONTEMNORS AFTER THE FILING OF
A BANKRUPTCY PETITION BY THE DEBTOR ................................. 6

    A.  THE SECTION 362(a) STAY APPLIES TO
        ARBITRATION PROCEEDINGS ............................................. 6

    B.  THE SECTION 362(a) AUTOMATIC STAY APPLIES
        TO ARBITRATIONS BEFORE A RELIGIOUS TRIBUNAL ............ 8

        (1) Enforcement of the § 362(a) automatic stay does not
            violate the First Amendment .......................................... 8

            (a) The Establishment Clause is not implicated at all
                in the matter at bar ............................................... 8

            (b) The Free Exercise Clause does not permit violation of a
                facially neutral law which is neutral in its general
                application ............................................................ 10

        (2) The Bankruptcy Court properly determined that the Religious
            Freedom Restoration Act does not prohibit enforcement of the
            automatic stay ............................................................ 13

            (a) Appellant correctly concedes that there is a compelling
                government interest in the enforcement of the automatic stay ... 14

            (b) There is no "substantial burden" on religion resulting from
                the automatic stay .................................................. 16

            (c) There are no "less restrictive means" of ensuring the
                protection of the compelling governmental interest in the
                bankruptcy stay other than by injunction ..................... 19

    C.  ARBITRATION PROCEEDINGS COMMENCED AGAINST A
        DEBTOR'S PRINCIPALS SEEKING TO DETERMINE PROPERTY
        RIGHTS OF THE DEBTOR IS THE FUNCTIONAL EQUIVALENT
        OF COMMENCING AN ACTION AGAINST THE DEBTOR ............ 21

CONCLUSION ................................................................................ 25

## TABLE OF AUTHORITIES

**Page**

***Judicial Authority***

*Bowen v. Roy*, 476 U.S. 693, 106 S. Ct. 2147, 90 L.Ed.2d 735 (1986)                    19

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014)                    10

*Cent. Rabbinical Cong. of United States & Canada v. New York City Dep't of Health
    & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014)                    10

*City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997)                    13

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)                    10

*FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, 2012 Bankr. LEXIS 5906,
    2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012)                    25

*Gray v. Hirsch (In re Gray)*, 230 B.R. 239 (Bankr. S.D.N.Y. 1999)                    25

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006)                    13

*Hosanna-Tabor Evangelical Lutheran Church & Sch v. E.E.O.C.*, 132 S. Ct. 694,
    706 181 L. Ed. 2d 650 (2012)                    12

*In re Benalcazar*, 283 B.R. 514 (Bankr. N.D. Ill. 2002)                    8

*In re Bidermann Indus. U.S.A.*, 200 B.R. 779 (Bankr. S.D.N.Y. 1996)                    25

*In re Chateaugay Corp.*, 93 Bankr. 26 (S.D.N.Y. 1988)                    8

*In re Collier*, 410 B.R. 464 (Bankr. E.D. Tex. 2009)                    23

*In re Congregation Birchos Yosef*, 535 B.R. 629 (S.D.N.Y. 2015)                    1

*In re Crysen/Montenay Energo Co.*, 902 F.2d 1098 (2d Cir. 1990)                    11

*In re Flack*, 239 B.R. 155 (Bankr. S.D. Ohio 1999)                    7

*In re Ionosphere Clubs*, 114 B.R. 379 (S.D.N.Y. 1990)                    7

*In re Scroggins*, 209 B.R. 727 (Bankr. D. Ariz. 1997)                    11

*In re Sharon*, 234 B.R. 676 (6th Cir. 1999)                    7

**TABLE OF AUTHORITIES (Continued)**

Page

*Judicial Authority (Continued)*

*In re Xavier's of Belville*, 172 B.R. 667 (Bankr. M.D. FL 1994)          4

*Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539 (11th Cir. 1996)          4

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)          18

*Listecki v. Official Comm. Of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015)          10

*Lemon v. Kurtzman, et al.*, 403 U.S. 602, 91 S.Ct. 2105 (1971)          9

*Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011)          16

*Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105 (2007)          9

*Priests for Life v. United States HHS*, 772 F.3d 229 (D.C. Cir. 2014)          16,18,19

*Ripley v. Mulroy*, 80 B.R. 17 (Bankr. E.D.N.Y. 1987)          25

*Singleton v. Wulff*, 428 U.S. 106, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976)          5

*Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011)          20

*Teachers Ins. & Annuity Asso v. Butler*, 803 F.2d 61 (2d Cir. N.Y. 1986)          25

*United States v. Lee*, 455 U.S. 252, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982)          19

*Universal Church v. Geltzer*, 463 F.3d 218 (2d Cir. 2006), *cert. denied*, 549 U.S. 1113 (2007)          11

*Legislative Authority*

11 U.S.C. § 362(a)          6

*Legislative History*

H.R.Rep. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News pp. 5787, 6297          8

S.Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), reprinted in U.S. Code Cong. & Admin. News at 5836          8

## TABLE OF AUTHORITIES (Continued)

Page

*Authoritative Texts*

3 Collier on Bankruptcy, P 362.06 at 362-76 (15th ed. rev. 2003)          6

## PRELIMINARY STATEMENT

This Brief is submitted on behalf of the Debtor, Congregation Birchos Yosef (the "Debtor"), in opposition to the appeal of Beis Din Mechon L'Hoyroa ("Appellant") from the July 2, 2015 Order of the Bankruptcy Court (Hon. Robert D. Drain) which, in relevant part, (i) held Bais Chinuch L'Bonois, Inc., Abraham Schwartz, Yechiel Yoel Laufer, and Yisroel David Rottenberg (collectively, the "Contemnors"), in contempt of Court for violation of the § 362(a) automatic stay, (ii) directed the Contemnors to discontinue a *beis din* (a Jewish arbitration proceeding) they had commenced before Appellant (a Jewish arbitration panel), (iii) cause any summons, injunction or threatened coercive sanction by Appellant to be withdrawn, and (iv) declared void *ab initio* any such summons or injunction, and enjoined the future issuance of the same and/or any coercive sanction by any *beis din*.

For the reasons set forth below, and in the Bankruptcy Court's written decision, the appeal should be denied in all respects, and the order of the Bankruptcy Court affirmed in all respects.[1]

## STATEMENT OF FACTS

After filing a chapter 11 case, the Debtor commenced adversary proceedings against the Contemnors and others in the Bankruptcy Court asserting various claims for fraud, breach of

---

[1] In its Opening Brief, Appellant states that its appeal is "from the Bankruptcy Court's bench ruling …" [Appellant Brief, p. 4]. However, on August 24, 2015, the Bankruptcy Court filed a written "Memorandum of Decision on Debtor's Motion to Enforce the Automatic Stay" [reported at 535 B.R. 629 (S.D.N.Y. 2015). For ease of reference, a copy of the same (as filed on the Bankruptcy Court docket) is annexed as an appendix entry to this Brief. The same is referred to herein as "Decision, p. ___". As can be seen, the same commenced with the statement by the Bankruptcy Court that "[t]his Memorandum of Decision amends and supersedes the Court's bench ruling, issued at the end of the July 1, 2015 hearing on a motion … of the debtor … to enforce the automatic stay under 11 U.S.C. § 362(a) against Bais Chinuch L'Bonois, Inc. ("Bais Chinuch") and certain named individuals and those acting with them, based on their post-bankruptcy invocation of a beis din proceeding against principals of the Debtor. … This Memorandum of Decision sets forth in more detail the reasons for that result."

fiduciary duty and looting of its assets, and seeking to recover funds that are allegedly due and owing from the Contemnors (defendants in those adversary proceedings) as a result of pre-petition actions on their part.  For ease of reference, copies of the Complaints in the adversary proceedings are appendix annexations to this Brief.

The Contemnors, with full knowledge of the Debtor's filing of its chapter 11 petition, and each being represented by counsel therein, nonetheless violated the automatic stay provisions of the Bankruptcy Code by initiating an arbitration proceeding against the Debtor's principals (but not the Debtor) before Appellant, a Jewish religious court, which then (i) issued a *hazmana* (the equivalent of a civil summons) to three of the Debtor's principals directing them to participate in a *beis din* proceeding to determine the parties' dispute – i.e., the claims in the adversary proceedings – and (ii) enjoined the Debtor's principals, through an *ekul* (the equivalent of a preliminary injunction) from continuing to pursue any claims in the adversary proceeding in the Bankruptcy Court.  The *hazmana*, or summons, also warned the Debtor's principals that if they did not discontinue the adversary proceedings, and instead participate in the *beis din* proceeding, to determine the Debtor's property claims, they could be subject to a "*sirov*" (or "Refusal to Comply with Jewish Law" Letter), which would be publicized and result in Draconian ramifications (such as the expulsion of the Debtor's principals' children from school).

The Debtor's counsel wrote to the Contemnors notifying them that they had violated the automatic stay by commencing the *beis din* proceeding with Appellant and causing the injunction (*ekul*) to be issued, and demanded the retraction of both.  Notwithstanding that warning, the Contemnors did not withdraw the *beis din* arbitration nor seek vacatur of the *ekul*.  Instead, Appellant thereafter issued a second summons (*hazmana*), again informing the Debtor's principals of the consequences of ignoring its summons, to wit the issuance of the *sirov*.  The Debtor's

principals could have chosen to ignore the injunction (*ekul*) and not appear before the *beis din*, but that choice would have resulted in clear and imminent harm.  The *beis din* proceeding and the threat of the *sirov* had already affected not only the Debtor's principals' standing in the community but also their children, who had been harassed and threatened with expulsion from school.  The Debtor then filed a motion before the Bankruptcy Court to enforce the automatic stay, seeking (i) a contempt order against the Contemnors for their violation of the automatic stay, (ii) vacatur of Appellant's purported injunction (*ekul*) (which purported to prohibit the Debtor from continuing the prosecution of the adversary proceedings), and (iii) an order enjoining the Contemnors, during the pendency of the bankruptcy proceeding, from (a) seeking, through Appellant or any other *beis din*, the issuance of any "*sirov*" (Refusal Letter) as a result of the Debtor's failure to arbitrate the pre-petition claims raised in the adversary proceeding or (b) commencing or continuing any *beis din* proceeding against the Debtor or its officers in connection with the claims in the adversary proceedings.

In response to that motion, the Contemnors filed objections, primarily raising the "defense" that the § 362 stay "does not apply to actions against non-debtors" (i.e., the Debtor's principals) [DE-73, pp. 4-5], and that they "did not and do not believe that religious proceedings in *bais din* against the [Debtor's principals], who are not debtors ... violated the automatic stay" [DE-73-1, ¶5].  They also argued that "[t]he 'church autonomy doctrine' of the First Amendment ... prohibits courts from interfering with the workings of a religious institution" [DE-73, p. 8], and that a court may not prevent a religious tribunal from penalizing a debtor for refusing to honor an injunction prohibiting the Debtor from pursing claims in secular court [*Id.*, pp. 8-9].  In effect, the Contemnors argued that a religious organization can ignore the law of the land simply because it is a religious organization.

With respect to their contention that commencing the post-petition arbitration proceeding against the Debtor's principals (rather than the Debtor) shielded them from the automatic stay, the Bankruptcy Court properly found that "there is no question that the Contemnors foresaw the consequences of their actions on the Debtor and the bankruptcy case and that they were engaging in considerable hypocrisy in arguing to the contrary before the Court."   Simply stated, the Bankruptcy Court correctly ruled that the Contemnor's protestation of "good faith" was nothing more than grand illusion, in any event irrelevant to the constitutional and statutory issues that they raised in their defense.[2]

With respect to the Contemnors' First Amendment argument, the Bankruptcy Court properly ruled that the facts established that this was a simple matter of whether or not the commencement of an arbitration (in *any* forum), seeking to resolve commercial disputes between a debtor and another person or entity, is violative of the automatic stay imposed by United States law.   The Bankruptcy Court found that it unquestionably was, and that enforcement of the automatic stay did not violate the Free Exercise or Establishment Clauses of the Constitution [DE-12-20].   Although not raised by the Contemnors, the Bankruptcy Court similarly ruled that enforcement of the automatic stay was not violative of the Religious Freedom Restoration Act (the

---

[2]  Where (as here) there is no dispute that the actions taken by the Contemnors were intentional and deliberate rather than inadvertent, the assertion that they were acting with a reasonable belief that the automatic stay did not apply is of no avail.  The motivation or belief of the party charged with violating the automatic stay is irrelevant to the requirement that the action be taken willfully.  In *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1555 (11th Cir. 1996), the court made clear that willfulness is established by the intentional commission of "the violative act, regardless of whether the violator specifically intended to violate the stay."  *See also In re Flack*, 239 B.R. 155, 162 (Bankr. S.D. Ohio 1999) ["To establish a willful violation, it must be shown that the party knew of the bankruptcy filing and then took some action, without regard to whether the party had specific intent to violate the stay or acted in good faith based upon a mistake of law or a legal dispute regarding its rights."]; *In re Xavier's of Belville*, 172 B.R. 667, 671 (Bankr. M.D. FL 1994) ["A violation of the automatic stay is willful if the action is done deliberately; no specific intent to violate a court order is necessary."].

"RFRA"), which applies a more restrictive limitation on governmental actions affecting religion than the Constitution does.   In that regard, the Bankruptcy Court determined that "the governmental interest in the automatic stay is compelling," that "[t]he automatic stay's enforcement here does not substantially burden the [Contemnors'] free exercise of religion … when they have invoked a rabbinical court to decide (and interfere with) an essentially commercial dispute, and "the automatic stay could not be more narrowly tailored without making a specific exemption for religious courts (which Congress has not done) and still serve the interests of preservation of value, efficiency and equality of distribution." [Decision, fn 6].

On this Appeal, Appellant[3] argues primarily that the Bankruptcy Court committed reversible error by ruling that the RFRA does not apply under the circumstances at bar, and (while conceding that the government's interest in enforcing the automatic stay is compelling) asserts that enjoining the *beis din* arbitration was purportedly not the least restrictive means of furthering the government objective.[4]   Appellant also adopts (albeit in only two short paragraphs in its Brief) the Contemnors' argument before the Bankruptcy Court that the automatic stay did not apply here

---

[3]   Appellant was not a party in the Bankruptcy Court and did not seek to intervene or submit any papers in that forum.   Nonetheless, for the sake of expediency, it will be assumed *arguendo* that Appellant has standing to prosecute this appeal and its arguments will be addressed on their substantive merits (or, rather, lack thereof).

[4]   The RFRA argument was not made by *any* of the Contemnors before the Bankruptcy Court. Arguments or issues not raised before a lower court ordinarily are not addressed on appeal. *Singleton v. Wulff*, 428 U.S. 106, 120, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976).   However, courts – including district courts sitting as appellate courts in bankruptcy matters – often do address legal arguments raised for the first time on appeal where the argument is clearly presented by the record. Since the RFRA issue was *sua sponte* considered by the Bankruptcy Court, and since this Court will review some of the issues *de novo*, the RFRA claims are addressed herein.   Additionally, an *amicus curiae* brief was submitted on consent by four law professors who also assert that the Bankruptcy Court's Order should be reversed (albeit frequently for different reasons than those urged by the Appellant).   The *amicus curiae*'s points are also addressed herein where appropriate.

because the *bais din* was commenced against the Debtor's principals and not the Debtor directly.[5]

For the reasons set forth herein (and in the written decision of the Bankruptcy Court), it is

respectfully submitted that the Appellant and the *amici curiae* are incorrect in their assertions and

that the Order and decision of the Bankruptcy Court should be affirmed in all respects.

## ARGUMENT

**THE BANKRUPTCY COURT
PROPERLY APPLIED THE SECTION
362(a) STAY TO THE *BEIS DIN* ARBITRATION
COMMENCED BY THE CONTEMNORS AFTER THE
FILING OF A BANKRUPTCY PETITION BY THE DEBTOR**

### A.   THE SECTION 362(a) STAY APPLIES TO ARBITRATION PROCEEDINGS

11 U.S.C. § 362(a) provides that the filing of a petition in bankruptcy "operates as

a stay, applicable to all entities," of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> * * * * *
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> * * * * *
>
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor.

"An examination of the legislative history of 11 U.S.C. § 362 reveals that 'the automatic

stay is one of the fundamental protections provided by the bankruptcy laws.'" 3 Collier on

---

[5] The *amici curiae* similarly argue that enforcement of the automatic stay violates the Contemnors' First Amendment Rights and the RFRA.  In contrast to the Appellant, however, the *amici curiae* do not concede that any compelling state interest exists for the enforcement of the automatic stay (in fact, they argue that it does not), and further argue that the § 362 stay is not applicable *at all* because the facts of this case purportedly do not fall within its technical language.

Bankruptcy, P 362.06 at 362-76 (15th ed. rev. 2003).  "Congress intended this provision to be liberally construed to fortify the protections of the automatic stay." *In re Flack*, 239 B.R. 155 (Bankr. S.D. Ohio 1999) (citing *In re Sharon*, 234 B.R. 676, 687 [6th Cir. 1999]).  As the *Flack* court explained (citations omitted, emphasis added):

> It is designed to effect an immediate freeze of the status quo by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy for or against the debtor *or affecting the property of the estate*. The automatic stay plays a vital and fundamental role in bankruptcy. The stay ensures that all claims against the debtor will be brought in a single forum, the bankruptcy court. The stay protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others.

239 B.R. at 162.  As the Bankruptcy Court in this case (Judge Drain) observed:

> The automatic stay under 11 U.S.C. § 362(a) is what it says: an automatic statutory injunction that came into effect upon the commencement of this chapter 11 case. It embodies Congress's determination that automatically staying all activity to the extent set forth in § 362(a) – including, as most relevant here, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title," 11 U.S.C. § 362(a)(1), and "any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3) – is a fundamental protection not only of debtors in bankruptcy cases, but also of debtors' estates and creditors.

As Judge Drain further observed, "[i]n a context where every dollar counts, the automatic stay prevents unilateral races to dismember the debtor and actions outside the bankruptcy court's supervision with their attendant diversion of resources and impairment of the debtor's value." [Decision, p. 6].  In that context, "[t]he stay also protects creditors interests by preserving their relative positions and preserving the remains of the debtor's estate against unsupervised dissipation through a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *In re Ionosphere Clubs*, 114 B.R. 379 (S.D.N.Y. 1990) (citing

*In re Chateaugay Corp.*, 93 Bankr. 26, 30 [S.D.N.Y. 1988]).  For those reasons, "the bankruptcy court has exclusive jurisdiction to impose sanctions for violation of the automatic stay." *In re Benalcazar*, 283 B.R. 514 (Bankr. N.D. Ill. 2002) at *6.

There is absolutely no doubt that the § 362(a) stay applies to bar a post-petition arbitration proceeding commenced without court approval.  Section 362(a)'s legislative history states in part (emphasis added): "All proceedings are stayed, including ***arbitration***, license revocation, administrative, and judicial proceedings … H.R.Rep. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S. Code Cong., & Admin. News pp. 5787, 6297; S.Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), reprinted in U.S. Code Cong. & Admin. News at 5836.

### B.  THE SECTION 362(a) AUTOMATIC STAY APPLIES TO ARBITRATIONS BEFORE A RELIGIOUS TRIBUNAL

Notwithstanding the undeniable application of the § 362(a) stay to arbitration proceedings, Appellant argues here that there is a required exception to the statute where the arbitration panel is of a religious nature.  Appellant advances, in substance, two arguments in that regard: (i) that a religious arbitration panel is immune from the law of the land because of the First Amendment's "separation of church and state," and (ii) that the "the least restrictive alternative" requirement of the RFRA is to simply not enforce they stay *at all* against a religious arbitration panel that attempts to determine a commercial dispute.  Each of those contentions (as well as those of the *amici curiae*) are discussed below.

#### (1) Enforcement of the § 362(a) automatic stay does not violate the First Amendment

##### (a) The Establishment Clause is not implicated at all in the matter at bar

Appellant first contends that the "church autonomy doctrine," based on either the Free Exercise or Establishment Clauses of the First Amendment to the Constitution, prohibits a court from enforcing the law of the land (i.e., the § 362(a) automatic stay) when an arbitration proceeding involving a commercial dispute between private citizens happens to have been commenced before

a religious arbitration tribunal.  But, as the Supreme Court noted in *Lemon v. Kurtzman, et al.*, 403

U.S. 602, 91 S.Ct. 2105 (1971):

> In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity."

To ascertain where those lines must be drawn the Supreme Court in *Lemon* set forth a now-

well known three-prong test for a statute to pass Establishment Clause muster: (i) the statute must

have a secular legislative purpose; (ii) its principal or primary effect must be one that neither

advances nor inhibits religion; and (iii) it must not foster an excessive government entanglement

with religion.  Each of the *Lemon* elements exist with respect to the Bankruptcy Code in general

and to § 364 in particular.[6]  The establishment Clause is, therefore, not really at issue in this case,

and neither Appellant nor the *amici curiae* seriously argue that it applies here.

---

[6] The Bankruptcy Code is intended to give an honest debtor an opportunity for a fresh start (*see Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105 [2007] and cases cited therein), and through the automatic stay provisions stop a race for the Debtor's assets and to have the claims of creditors dealt with in one forum (*see* Legislative History H. Rep. No. 95-595 95th Long, 1st Session 340-2 [1977]; S.R. No. 95-989 95th Cong. 2nd Sess. 49-51 [1978]).  Accordingly, it cannot be disputed (and is not disputed by Appellant or the *amici curiae* here) that the stay provision in the Bankruptcy Code has a "primary secular legislative purpose" without regard to religious beliefs.  Similarly, the *primary* effect of § 364 neither advances nor inhibits religion; it simply ensures consistent application of the Bankruptcy Code.  Unlike other landmark decisions regarding laws which were claimed to impact religious practices, there is nothing in the Bankruptcy Code which even arguably advances or inhibits any aspect of religion.  Finally, although § 364 may tangentially *involve* religion, it certainly does not foster "an excessive government entanglement with religion."  As noted in *Lemon, supra*, 403 U.S. at 614 (citations omitted:

> Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense.  Some relationship between government and religious organizations is inevitable.

**(b) The Free Exercise Clause does not permit violation of a facially neutral law which is neutral in its general application**

Appellant's position here is, in effect, that, under the Free Exercise Clause of the First Amendment, once a party files for arbitration before a *beis din,* the bankruptcy court loses the ability to enforce the bankruptcy law, and a debtor who would otherwise enjoy this protection is sucked into the vortex of religious law and put at risk of having Draconian sanctions issued against it despite the protection of the Bankruptcy Code. Put another way, Appellant argues that the Free Exercise Clause permits a religious organization to ignore the law of the land simply because it is a religious organization. As the Bankruptcy Court correctly pointed out however, rights under the Free Exercise Clause are severely limited by Supreme Court precedent, including *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-79, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), which was cited last year in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014), and held that, "under the First Amendment, neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." 134 S. Ct. at 2761 (internal quotations and citations omitted). *See also Listecki v. Official Comm. Of Unsecured Creditors*, 780 F.3d 731, 742 (7th Cir. 2015), quoting *Hobby Lobby*, 134 S. Ct. at 2761, and applying *Smith* to uphold application of the Bankruptcy Code's transfer avoidance provisions over an archdiocese's argument that to do so unduly restricted the free exercise of religion.

Under *Smith*, the Free Exercise Clause requires that a statute be facially neutral and neutral in its general application (i.e., that it is not in practice aimed or used to promote or restrict religious belief). *Smith*, 494 U.S. at 881-83. *See also Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d at 743-45; *Cent. Rabbinical Cong. of United States & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) [a law may burden religious conduct

10

under the First Amendment if it is both neutral and generally applicable], and *Universal Church v. Geltzer*, 463 F.3d 218 (2d Cir. 2006), *cert. denied*, 549 U.S. 1113 (2007) ["It is well established that a generally applicable law that does not target religious practices does not violate the Free Exercise Clause … regardless of the burden it may place on the religious practices …"].

> As the Bankruptcy Court correctly observed:

> The automatic stay is clearly neutral on its face and is also neutral and generally applicable, as far as religious exercise is concerned, in practice. It applies to anyone who falls within the ambit of 11 U.S.C. § 362(a) (here, to anyone who commences a proceeding or takes another action covered by either 11 U.S.C. § 362(a)(1) or (3)). It prohibits the invocation of all covered proceedings, whether in state or federal court, a foreign court, or a *beis din*. To the extent relevant, the clearly secular interests that the automatic stay protects – to prohibit self-help and funnel all of the activity covered by the stay through the bankruptcy court from the instant that the bankruptcy case commences until, after motion on proper notice, the court lifts the automatic stay in light of neutral interests that Congress believed warrant such relief – are not directed at religious observance or excessively entangled with religion.

[Decision, p. 17, citing *In re Crysen/Montenay Energo Co.*, 902 F.2d 1098, 1105 (2d Cir. 1990).

Indeed, there is not a single case cited by Appellant or the *amici curiae* which, in a bankruptcy context, holds otherwise. Yet, there are several which support Judge Drain's order. In *Universal Church v. Geltzer*, 463 F.3d at 227-28, for example, a church which was the subject of an application for statutory avoidance of a portion of a charitable contribution asserted that applying the avoidance statute to it would be violative of the Free Exercise Clause. The court, ruling that the secular purpose of the avoidance provisions in the Bankruptcy Code was to protect the interests of creditors against fraudulent transfers, and that the same applied equally to religious and non-religious entities, held that the same were constitutional.

Similarly, in *In re Scroggins*, 209 B.R. 727, 730-31 (Bankr. D. Ariz. 1997), a church refused to release educational transcripts of a debtor's minor daughter because the debtor was in pre-petition arrears in tuition payments. The Court, finding that the church's refusal to release the

transcripts was in furtherance of a post-petition attempt to collect a pre-petition debt, concluded that the church's actions violated § 362 the automatic stay and rejected the church's arguments that it could not be compelled to release the transcripts because such an order would (i) be an unconstitutional intrusion into religious affairs, and (ii) be violative of the RFRA.

Here, there can be no serious dispute that § 362 is facially neutral and neutral in its general application (i.e., that it is not in practice aimed or used to promote or restrict religious belief) and, therefore, is enforceable in the face of a Free Exercise Clause challenge. The Bankruptcy Court's well-reasoned and thorough determination that there is no Free Exercise Clause impediment to enjoining an arbitration proceeding commenced in violation of the automatic stay is, it is respectfully submitted, unassailable.[7]

---

[7] The *amici curiae* advance the proposition that, under the Free Exercise Clause, "where … the sole purpose of a religious tribunal is to function as a non-coercive forum of religious conscience, the state lacks the power to forbid believers from seeking guidance." However, that statement (even if true) is irrelevant under the facts of this case. Here, the Contemnors did *not* seek "religious guidance" from the *beis din*; they sought instead to have it resolve commercial claims of fraud and breach of fiduciary duty between private parties. The *beis din* was *not* acting as a "non-coercive forum of religious conscience;" instead it was acting as a determiner of a commercial dispute, an issuer of an anti-suit injunction, and a threatener of *extremely* coercive non-compliance penalties.

The single case citing by the *amici curiae* – *Hosanna-Tabor Evangelical Lutheran Church & Sch v. E.E.O.C.*, 132 S. Ct. 694, 706 181 L. Ed. 2d 650 (2012) – bears no factual or ideological resemblance to the matter at bar. In *Hosanna-Tabor*, a church was sued by the E.E.O.C for violation of the Americans with Disabilities Act, based on the firing of one of the church's ministers. The Church argued that the suit was barred by the First Amendment because the claims at issue concerned an employment relationship between a religious institution and one of its ministers. The Supreme Court adopted a narrow "ministerial exception" to the application of employment discrimination laws, ruling that the government was prohibited from "interfering with the decision of a religious group to fire one of its ministers" because "the interest of religious groups *in choosing who will preach their beliefs, teach their faith, and carry out their mission*" was of critical importance, and "[t]he church must be free to choose those who will guide it on its way" [emphasis added]. The concurring opinions agreed that the Free Exercise Clause "require[s] civil courts to apply the ministerial exception and to defer to a religious organization's good-faith understanding of who qualifies as its minister" [132 S. Ct. at 710], and that "[t]he Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith" [132 S. Ct. at 713]. The assertion by the *amici curiae* that "the same norm or religious autonomy recognized in *Hosanna-Tabor* is at issue" in this

### (2) The Bankruptcy Court properly determined that the Religious Freedom Restoration Act does not prohibit enforcement of the automatic stay

Appellant next argues that the Bankruptcy Court erred in holding that the enforcement of the stay in this case does not violate the Religious Freedom Restoration Act, 42 U.S.C. §2000bb-1(a) and (b) [the "RFRA"], which applies a more restrictive limitation on governmental actions affecting religion than does the First Amendment.  In order for a statue to withstand scrutiny, the RFRA requires a "compelling governmental interest" in enacting and enforcing the statute and, if the statute "substantially burdens" the exercise of religion, that it be the "least restrictive means" of serving such interest. *Id.  See also Hobby Lobby, supra*, 134 S. Ct. at 2767.[8]

---

case [Amicus Brief, p. 4] is perplexing.  Here, there is no issue regarding interference with any choice of a church's doctrinal messenger; the sole issue is whether a defendant in an adversary proceeding can commence a post-petition arbitration in violation of a neutral law.

Moreover, contrary to the *amici curiae's* assertion that a *beis din* has no power beyond "purely volitional religious-social relationships," any determination of the *beis din is* enforceable against the Debtor (as any arbitration award would be) if the Debtor succumbed to the pressure and participated in the *beis din*.  Finally, where (as here) a debtor seeks to recover assets that have allegedly been stolen from it, the rights of creditors (who are *not* all part of the debtor's religious community) are also at issue.  As the Bankruptcy Court noted: "the automatic stay protects the debtor's estate *and other creditors* too, who, except for the rare bankruptcy case, are not all subject to the same religious strictures and institutions, including the customary resolution of disputes by a religious court." [Decision, p. 19-20].  In short, enjoining an arbitration proceeding commenced in violation of the automatic stay clearly does *not* fall within the very narrow "ministerial exception" adopted by the Supreme Court in *Hosanna-Tabor* because it does not interfere in any way the choice of a church's doctrinal messenger.

[8]  Although the Supreme Court initially held the RFRA unconstitutional as applied to the states because it violated *Smith*'s interpretation of the proper constitutional standard to be applied (*City of Boerne v. Flores*, 521 U.S. 507, 519, 117 S. Ct. 2157, 138 L. Ed. 2d 624 [1997]), Congress thereafter enacted the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc, *et seq.*, which amended RFRA's definitions to modify the scope of its protection.  In 2006, the Second Circuit held that the amended RFRA was constitutional as applied to federal law (*Hankins v. Lyght*, 441 F.3d 96 [2d Cir. 2006].  Thus, although the Supreme Court has not yet passed specifically on the constitutionality of the amended RFRA, it is assumed for this appeal that it is enforceable in connection with (at least) federal statutes.

***(a) Appellant correctly concedes that there is a compelling government interest in the enforcement of the automatic stay***

Here, "Appellant concedes that the automatic stay of section 362 serves a compelling governmental interest" [Appellant's Brief, p. 19]. Appellant is correct in that concession. The *amici curiae*, however, disagree, arguing that "enjoining the *beis din*'s issuance of a purely religious sanction does not further any compelling state interest" [*Amicus* Brief, page 8]. The *amici curiae*, however, distort the nature of what the Bankruptcy Court redressed here. Here, it did not simply "enjoin a purely religious sanction," it (i) declared invalid the commencement and continuation of an unauthorized arbitration proceeding and the issuance of a purported "injunction" prohibiting the Debtor from collecting assets of the estate in the Bankruptcy Court, and (ii) prohibited the arbitration panel from taking coercive action intended to compel the Debtor to itself violate the automatic stay by participating in the unauthorized arbitration. It matters not a whit what *form* the arbitration panel's threatened sanction takes, it is the *issuance* of *any* sanction intended to coerce a debtor into participating in an arbitration violative of the automatic stay that must be enjoined for the stay to have any effectiveness. To argue, as the *amici curiae* do, that, on the one hand, they do *not* support the propriety of a *beis din*'s attempt to "exercise … control over estate property" (by *actually* conducting an arbitration proceeding to determine a debtor's property rights) [Amicus Brief, p. 2], yet, on the other hand, that they "support" a *beis din*'s "right" to issue a coercive sanction intended to compel participation in the very arbitration proceeding that the *amici curiae* condemn, is perplexing. In effect, they argue that conducting an unauthorized arbitration to determine a debtor's property rights *is* violative of the automatic stay, yet the imposition of a coercive sanction (i.e., a *sirov*), carrying very real, and very severe, ramifications (including, among other things, the expulsion of a debtor's principals' children from school) if the

14

debtor refuses to participate in the illegal arbitration is not.  It is an incomprehensibly contradictory argument.[9]

---

[9]   The *amici curiae*'s subsequent strained attempt to somehow justify their untenable and contradictory position – by arguing that the commencement of an arbitration proceeding without the permission of the Bankruptcy Court somehow "does not impair" the government interest incident to the automatic stay – is equally illogical.  After conceding that the Bankruptcy Court correctly described the "crucial role" the automatic stay plays as "the fundamental protection of debtors and their estates during the bankruptcy case" (serving not only a debtor but a debtor's creditors), the *amici curiae* nonetheless contend that the threatened issuance by the *beis din* of a coercive sanction intended to compel a debtor to discontinue its efforts to retrieve assets in the Bankruptcy Court has no adverse effect on the "purposes" of the automatic stay, and prohibiting such actions purportedly "does not forward any of the important interests the stay serves." [*Amicus* Brief, page 9].  But preventing the "commencement or continuation … of a judicial, administrative, or other action or proceeding" is *specifically* what the automatic stay *requires*, and does so *precisely* to "ensure the orderly determination of the debtor's liabilities, realization on the estate's assets, and allocation of that value to creditors and interest holders."  The logic behind the *amici curiae*'s argument that enjoining a coercive sanction intended to compel a debtor to participate in an arbitration in violation of the automatic stay (and removing from the Bankruptcy Court the ability to determine the appropriate disposition of a debtor's assets) somehow does not further the interests that the stay seeks to protect is difficult to fathom.

Moreover, applying the position of the *amici curiae* to an (admittedly extreme, however unfortunately real) situation (albeit in another part of the world), the untenable nature of their argument becomes apparent.  Suppose that a religious organization "believes" that a woman member of its community who is raped is prohibited from seeking criminal redress against the rapist.  Further suppose that, in response to the woman filing a criminal complaint against the rapist, the religious organization's "court" directs her to withdraw the complaint (or "enjoins" her from proceeding with the same), and, failing her compliance, threatens to issue a "declaration" that she is and "informant" and has failed to adhere to the religion's requirements (and thereby subjects her, according to the tenets of the religion, to being "stoned" by members of the religious community).  Could it seriously be argued that a court in the United States would be improperly interfering with religious practices by declaring void *ab initio* the religious panel's purported "injunction" against the woman assisting in the prosecution of the rape, or by enjoining the threatened "purely religious" sanction if she refused to discontinue such assistance?  Could it seriously be argued that the issuance of a declaration that the victim was an "informant" (resulting in pressuring her to discontinue the prosecution of the rapist) would have "no effect" on the legitimate government interest to protect citizens against sexual assault?  Although admittedly an unthinkable example (at least in the United States), it illustrates, we believe, the illogic of the *amici curiae*'s argument that a purportedly "purely religious" coercive sanction may not be enjoined even if the same is intended to compel a violation of secular law.

15

### *(b) There is no "substantial burden" on religion resulting from the automatic stay*

In analyzing the substantiality of a burden under the RFRA, the courts employ an objective test. RFRA plaintiffs must show that the government has imposed a burden that is actually substantial, not simply one that they *believe* is substantial. While unquestionably it is the religious observer's (and not the court's) right to determine what religious observance their faith commands [*Priests for Life v. United States HHS*, 772 F.3d 229, 247 (D.C. Cir. 2014)], "[a]ccepting the sincerity of Plaintiffs' beliefs … does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise." *Id.* "Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact." *Id.* If RFRA plaintiffs needed only to assert that their religious beliefs were substantially burdened, federal courts would be reduced to rubber stamps, and the government would have to defend innumerable actions under the demanding strict scrutiny analysis. *See Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) [concluding that judicial inquiry into the substantiality of the burden "prevent[s] RFRA claims from being reduced into questions of fact, proven by the credibility of the claimant"]. The fact that an RFRA plaintiff considers a statutory burden substantial does not make it a substantial burden. Were it otherwise, no burden would ever be insubstantial.

Here, Appellant claims that a substantial burden on its ability to practice its religion exists because "preventing a religious tribunal from performing its role as a gatekeeper for access to the religious community is necessarily a substantial burden on the free exercise of religion." [Appellant's Brief, p. 17]. However, that is *not* what the § 364 stay does, nor what the Bankruptcy Court did here. The statute simply prohibits, *while a bankruptcy proceeding is pending,* any other proceeding (outside of the control or supervision of the Bankruptcy Court) from being commenced or maintained that would affect or determine a debtor's property rights. Requiring a religious

organization to comply with a requirement that the collection and disposition of a debtor's assets must take place in the Bankruptcy Court does not place any "substantial burden" on the practice of its religion any more so than subjecting a religious organization to statutory claw-bank provisions does, nor does it in any way imaginable prevent it from acting as a "gatekeeper for access to the religious community" (whatever that means). Appellant's argument in that regard is unavailing.

The *amici curiae* approach the issue from a slightly different perspective. They argue that it is *only* the Bankruptcy Court's injunction *against the issuance of a coercive sanction* (a *sirov*) by the *beis din* which constitutes a "substantial burden" because it purportedly prohibits a religious organization from "expressing religious disapproval at [the] filing [of a bankruptcy petition]." But, again, that is *not* what the statue does nor what the facts establish to have been the purpose of the *beis din* here.[10]  The purpose of the commencement of the *beis din* proceeding here was *not* to

---

[10] The *amici curiae* repeatedly contend that the Contemnors "admit that the assets of the estate – and their commercial value – will be controlled by the Bankruptcy Court," notwithstanding the commencement of the *beis din* arbitration [*See*, for example, *Amicus* Brief, p. 11]. But that supposed "admission" has no basis in reality. As was pointed out above, the specifically identified subject matter of the subject *beis din* arbitration, as set forth in the summons issued by the Appellant, was to "arbitrate ... the claims that you have between yourselves [the Debtor and the Contemnors] ... And we hereby restrict continuing the claims before the secular courts." Those claims, as set forth in the adversary proceeding complaints, involve (among others) commercial claims of fraud and breach of fiduciary duty and seek to recover assets belonging to the Debtor's estate. Contrary to the Contemnors' purported "admission," the reality (as the Bankruptcy Court properly ruled after conducting a hearing) is that the purpose of the *beis din* to "decide (and interfere with) an essentially commercial dispute" [535 B.R. at 637]. That was not, as the *amici curiae* allege, an "assumption" on the part of the Bankruptcy Court [Amicus Brief, p. 11], it was an evidentiary finding of fact. Moreover, had the *beis din* simply issued a request to the Debtor's principals to provide evidence that the Debtor had obtained prior Rabbinical permission to commence the adversary proceedings (which the Debtor in fact did), the factual posture would be quite different. But the *beis din* did not do that; instead it directed the Debtor's principals to arbitrate all of the Debtor's adversary proceeding claims before the *beis din* and discontinue the prosecution of the adversary proceedings.

decide whether to "express religious disapproval" about *anything*, nor to determine any "religious issues," nor to express "dissatisfaction" with the filing of the bankruptcy petition.  Instead, it was, as is clear from the summons (and as the Bankruptcy Court correctly found), to determine property rights of the Debtor that are exclusively within the jurisdiction of the Bankruptcy Court, and which property rights *all* other tribunals are statutorily stayed from determining.  The "imposition" of having to (like every other citizen ion the United States) abide by a bankruptcy court's determination of property rights of a debtor falls well below the degree of "substantial burdensomeness" that has historically entitled a RFRA plaintiff (or pre-*Smith* Free Exercise plaintiff) to accommodation, or triggered a strict scrutiny analysis.[11]  *See Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) [noting that "[a]n inconsequential or *de minimis* burden on religious practice does not rise to [the] level" of a substantial burden].[12]

---

[11] Pre-*Smith* First Amendment Free Exercise cases, which remain instructive in interpreting RFRA (*see Priests for Life*, *supra*, 772 F.3d at 244), involved much more significant effects on the lives of religious objectors.   Those cases dealt with, for example, (i) denial of unemployment compensation to an employee who was discharged because she refused to work on Saturday, her religion's day of rest [374 U.S. at 399-401]; (ii) a requirement for an Amish family to send their children to school in violation of their religion [406 U.S. at 207-08]; and (iii) the denial of unemployment insurance to a religious pacifist after he quit his job following a transfer to a department where he was required to work in the production of armaments [450 U.S. 707, 709]. Post-*Smith* cases finding a substantial burden under RFRA have similarly involved much more significant burdens on religious objectors, such as (i) requiring a prisoner to suffer an invasion of his bodily integrity by undergoing a physically-invasive and religiously-objectionable medical screening [796 F.3d at 219]; (ii) preventing religious objectors from engaging in a 29 sacramental ritual [546 U.S. at 425-26]; (iii) requiring corporations to pay for the use of religiously-objectionable contraceptives or pay significant fines [134 S. Ct. at 2775-79], and (iv) requiring a prisoner to cut his beard in violation of his religious mandate to wear a beard [135 S. Ct. at 862]. Here, by contrast, Appellant was not denied any similar government benefits, nor required to submit to the invasion or alteration of a human body, nor was it required to do anything except abide (as every citizen is required to do) by a determination of a debtor's property rights by the Bankruptcy Court.

[12] Moreover, as was discussed above, the disposition of a debtor's property rights necessarily affects the rights of creditors who are not members of the debtor's religious sect. The requirement that those rights be determined by a Bankruptcy Court (rather than a private arbitration tribunal)

Moreover, "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982).[13]  The natural extension of that rule is that the burden to comply with regulatory schemes incident to the commercial activities feely entered into cannot reasonably be argued to constitute any greater "substantial burden" *on religion*, than it is on *anyone* who voluntarily engages in such activities.

### (c) There are no "less restrictive means" of ensuring the protection of the compelling governmental interest in the bankruptcy stay other than by injunction

Although conceding that there is a compelling government interest in the enforcement of the automatic stay, Appellant argues that application of the stay to a "religious" arbitration panel is purportedly not the "least restrictive means of ensuring the protection of that compelling governmental interest." [Appellant Brief, p. 19-20].  Appellant does not, however, seriously offer any realistic "less restrictive" alternative.  Indeed, Appellant's sole proposed "less restrictive" solution is for Congress to simply "exempt religious tribunals who are hearing and determining religious questions from the stay."[14]  But eliminating entirely the requirement for a particular

_____

is for the benefit of those creditors as well.  Even though the determination of property rights in a proceeding other than a *beis din* may be objectionable to Appellant, it unquestionably "has no RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors." *Priests for Life*, *supra*, 772 F.3d at 246 (citation omitted).  "Just as the Government may not insist that [Plaintiffs] engage in any set form of religious observance, so [Plaintiffs] may not demand that the Government join in their chosen religious practices by refraining from" having a debtor's property disputes determined in Bankruptcy Court.  *Bowen v. Roy*, 476 U.S. 693, 699-700, 106 S. Ct. 2147, 90 L.Ed.2d 735 (1986).

[13]  The Bankruptcy Court put it this way: "The automatic stay's enforcement here does not substantially burden the objectors' free exercise of religion … when they have invoked a rabbinical court to decide (and interfere with) an essentially commercial dispute."

[14]  Even if that "solution" was realistic (which it is not), it would be of no avail to the Appellant on the facts here.  The arbitration proceeding at issue here was *not* to address "religious issues," its purpose was to determine "the claims that [the Debtor and the Contemnors] have between

arbitration tribunal (religious or otherwise) to comply with the statute does not "advance" what Appellant admits is the substantial government interest; rather, it completely *eliminates* it.[15]  To suggest that a statute can be "less restrictively" enforced by simply eliminating enforcement of the same *altogether* is, at best, an oxymoron.  By way of yet another extreme example, if a religious group had a "legitimate" belief that the first born son of every family within its community was required to be killed as a sacrifice to a deity, would a "less restrictive" manner of enforcing criminal

---

[them]selves ..."  Those claims (as asserted in the complaints in the adversary proceedings) have nothing whatsoever to do with "religious questions," but rather seek to recover funds diverted through pre-petition fraud, breach of fiduciary duty and looting of the Debtor's assets.

[15]  The *amici curiae* approach the same issue in a different context.  They argue that, since § 362(b) contains exceptions to the stay in certain secular situations, Congress is constitutionally required to exempt religious arbitrations from the stay as well.  However, the "secular exemptions" contained in the statute are (aside from being completely neutral) *not* for particular *tribunals*, but rather for particular *situations* where the Bankruptcy Court has no jurisdiction over the subject matter of the dispute and cannot statutorily determine such matters.  Thus, criminal proceedings, domestic relations matters (paternity, marriage dissolution, child support, custody and visitation, and domestic violence), and matters covered by the Social Security Act, are exempted from the stay.  All of those subject matters, however, statutorily vest jurisdiction in one or another specific court, and the Bankruptcy Court, as a matter of law, has no jurisdiction to determine those matters.  Indeed, under 28 U.S.C. § 157(b)(2)(C) Bankruptcy Court subject matter jurisdiction is limited to cases arising under the Bankruptcy Code (core matters), and it may make findings of fact for District Court referral in cases that that do not arise under the Bankruptcy Code but that nonetheless have some effect on the debtor's assets (non-core matters).  *See, Stern v. Marshall*, 131 S. Ct. 2594, 2601-2602, 180 L. Ed. 2d 475, 486 (2011).  Criminal, domestic relations and Social Security matters are simply not within the Bankruptcy Court's jurisdiction, except where "such proceeding seeks to determine the division of property that is property of the estate", in which case the statutory exemptions *do not apply* [subd (b)(2)(A)(iv)] (and collection efforts may be made *only* "from property that is not property of the estate" [subd (b)(2)(B)].  These exemptions from the automatic stay for matters that the Bankruptcy Court statutorily has no jurisdiction over (and the exclusion from the exemption for estate property that it does have jurisdiction over) is a far cry from what the *amici curiae* propose here – excluding from the automatic stay *any* proceedings before *any* arbitration tribunal that is of a religious nature, even where that tribunal seeks to determine commercial property rights issues specifically within the jurisdiction of the Bankruptcy Court.  Congress certainly has no constitutional *requirement* to exclude particular arbitration panels from the reach of the automatic stay under those commercial circumstances simply because the tribunal happens to be of a religious nature.

murder statutes be to simply not prosecute the murderer and leave it to the internal laws of the religious sect?  Appellant's argument is, respectfully, absurd on its face. [16]

### C. ARBITRATION PROCEEDINGS COMMENCED AGAINST A DEBTOR'S PRINCIPALS SEEKING TO DETERMINE PROPERTY RIGHTS OF THE DEBTOR IS THE FUNCTIONAL <u>EQUIVALENT OF COMMENCING AN ACTION AGAINST THE DEBTOR</u>

In a two-paragraph argument, Appellant contends that "because the [*beis din*] proceedings were commenced by non-debtors against non-debtors," the Bankruptcy Court did not have the ability to stay those proceedings when it did [Appellant's Brief, p. 21].  Here again, the Appellant's argument consists of almost incomprehensible circular reasoning: "while the Bankruptcy Court may ultimately issue an injunction preventing further proceedings before the *Beis Din*, it

---

[16]  The *amici curiae* do not earnestly argue that there is any realistic less restrictive alternative either.  In a single footnote, the *amici curiae* suggest that managing the assets of a debtor's estate effectively (which they claim is the primary "purpose" of the automatic stay) can be obtained in a less restrictive manner by "appointing a trustee or an examiner and defining his parameters" under 11 U.S.C. §§ 1104 and 1106 [Amicus Brief, fn 7].  But that suggestion is illogical in this case for three reasons.  First, a § 1104 Trustee (vested with § 1106 powers) can be appointed *only* when the present management of a debtor has engaged in "fraud, dishonesty, incompetence, or gross mismanagement" of the affairs of the debtor.  There is no such allegation before the Bankruptcy Court here.  Secondly, and more importantly, a Trustee simply "stands in the shoes" of the debtor's management for the purposes of managing the debtor's affairs (including the retrieval of estate assets).  If an arbitral panel is not enjoined from determining the disposition of those assets, then the Trustee (in his or her capacity as the equivalent of the debtor) would be required to litigate the issues in that forum as well.  Moreover, what if, after the appointment of a Trustee, the arbitration panel issues an "order" (under threat of coercive "religious" sanctions) that enjoins the debtor's principals from cooperating with the Trustee in pursuing its property right in an adversary proceeding?  Such an order would clearly eliminate any benefit to having a Trustee appointed and would ultimately divest the Bankruptcy Court of its ability to administer estate assets.  *Clearly*, the appointment of a §1104 Trustee (absent an injunction against an outside arbitration panel from determining the Debtor's property rights vis-à-vis the Contemnors) would not, *in any manner*, ensure the "fundamental protection of debtors and their estates during the bankruptcy case."  Third, if a Debtor is faced the prospect of removing control of its business from it where its administrators have committed no wrongdoing, simply because a religious forum attempts to assert jurisdiction over the debtor's assets, then the devastatingly chilling effect on bankruptcy filings would compromise the entire statutory scheme (at least for debtors who are members of religious groups).

committed reversible error in determining that the [*beis din* summonses] were void *ab initio* as

violating the stay" [*Id.*].   Thus, while Appellant concedes that the *beis din* proceeding was

enjoinable by the Bankruptcy Court after its commencement [even though commenced by non-

debtors against non-debtors], it argues that the Bankruptcy Court somehow erred by declaring the

improper proceeding improper from its inception.   Frankly, if Appellant's perplexing logic in that

regard is correct, it would be equally correct that, after a person steals the property of another

person, a court could enjoin the thief from *keeping* the property but could not rule that the property

was improperly stolen *ab initio*.   The Appellant's curious position is simply illogical.[17]

---

[17] The *amici curiae*, once again, advance a contrary view, devoting a large portion of their Brief
to the erroneous contention that the commencement of the *beis din* arbitration "did not violate the
automatic stay" *at all* for three reasons.   First, they argue that "the *beis din* could not have been
commenced prior to the bankruptcy filing" [Amicus Brief, p. 13].   However, that argument is based
upon their faulty reasoning that "the harm complained of in the *beis din* was the filing of the
adversary proceeding in the Bankruptcy Court" [*Id.*].   In fact, the purpose of the *beis din*, as stated
on the face of the two summonses issued by Appellant, was to determine "the claims that [the
Debtor and the Contemnors] have between [them]selves."   Those "claims" unquestionably
consisted of the causes of action asserted in the adversary proceedings seeking damages for (among
other things) fraud and breach of fiduciary duty, and recovery of the Debtor's property.   *All* of the
acts complained of in the adversary proceedings took place *prior* to the filing of the Debtor's
petition and, therefore, *could have been* commenced prior to that filing.   The *amici curiae*'s first
argument it, therefore, unpersuasive.

Secondly, the *amici curiae* argue that the *beis din*'s issuance of a purportedly "purely religious
sanction does not constitute control" over any asset of the Debtor.   Again, the *amici curiae*'s logic
is difficult to understand.   While admitting that the adversary proceedings commenced by the
Debtor, and the causes of action asserted therein, are "property of the estate," and while further
conceding that "the stay does bar post-petition claims that are aimed at controlling property of the
estate," the *amici curiae* incredibly argue that the commencement of the *beis din* arbitration
purportedly does "not constitute an act 'to exercise control over' that proceeding" [Amicus Brief,
p. 13-14].   Clearly the *only* purpose of the commencement of the *beis din* (contrary to the
Contemnor's counsel's statements during the hearing below upon which the *amici curiae* entirely
rely) was to "control" the adversary proceedings by determining the commercial property issues
between the Debtor and the Contemnors raised therein.   The subject matter of the adversary
proceedings was set forth on the face of the summonses issued by the Appellant, and not the
contrary revisionist history version the Contemnor's counsel orally argued before the Bankruptcy
Court (which is inconsistent with the language in the summonses).   The *beis din* proceeding was
not only "intertwined" with and "duplicative of" the adversary proceedings, it was *identical* to the

Moreover, from a substantive perspective, there is no question that the *beis din* arbitration the Contemnors' commenced was an attempt to arbitrate claims made by the Debtor in the adversary proceedings.   The summonses (*hazmana*) issued by the Appellant stated: "The administration of Bais Chinuch ... have come before us, and showed us that you have brought before the secular courts, the litigation and quarrel that you have with the Administrators of the aforementioned school … However, none of the Debtor's officers personally had any "litigation" or "quarrel" with Contemnors before the "secular courts" (i e., the Bankruptcy Court).  The only entity that brought any such "litigations" or "quarrels" was the Debtor in the adversary proceedings. To be sure, the only thing the Contemnors were trying to prevent was the prosecution of those claims *by the Debtor*.   The language on the face of the summonses (*hazmana*) in the *beis din* arbitration made that clear: "[w]e invite you, at the request of [the Contemnors] … to arbitrate ... the claims that you have between yourselves ..."  This language cannot reasonably be construed as

---

adversary proceedings because it sought to determine the very causes of action raised in the adversary proceedings.  The *amici curiae*'s second argument is also unpersuasive.

Finally, the *amici curiae* argue that the Bankruptcy Court's view of the commencement of the *beis din* by the Contemnors as "an insincere and cynical attempt to control estate property" (rather than a purely "religious" act) was erroneous because the Bankruptcy Court cited the case of *In re Collier*, 410 B.R. 464 (Bankr. E.D. Tex. 2009) [which held that the erection of a post-petition sign that sought to compel payment of a pre-petition debt was violative of the stay].  However, the *amici curiae* misstate the context in which the Bankruptcy Court cited *Collier*.  In fact, that case was cited by the Bankruptcy Court, *together with three other cases*, to stand for the proposition that enforcement of the automatic stay is proper "notwithstanding the First Amendment's protection of free speech, provided the speech at issue was coercive."  [Decision, p. 18].  The Bankruptcy Court did not *anywhere* in its decision attempt to compare "a sign" to a *beis din* summons (the issuance of a post-petition arbitration summons being a far *more egregious* violation of the stay); it simply made the correct observation that coercive speech (e.g., the issuance of a written threat intended to coerce a debtor into dropping adversary proceedings claims) was not protected under the First Amendment.  Nor did the Bankruptcy Court cite *Collier* in support of its finding that the *beis din* was a transparent attempt to exercise control over the Debtor's asset (i.e., the claims asserted in the adversary proceedings); that finding was *evidentiary* in nature and compelled by (among other things) the clear and unambiguous language in the summonses.

referring to anything other than *the Debtor's* adversary proceedings claims against the Contemnors to recover property belonging to the Debtor.  The Contemnors knew *exactly* what they were doing, and what they intended to accomplish: to compel the Debtor to arbitrate its claims before the *beis din* rather than in the adversary proceedings.  Obtaining a purported "injunction" against the principals of a corporate debtor – which compelled those principals to not prosecute adversary proceedings commenced *by that debtor* – was nothing more than a parlor trick which was easily seen through by the Bankruptcy Court.  As the Bankruptcy Court put it [Decision, p. 6-8, citations omitted]:

> Bais Chinuch and the individuals who invoked the *beis din* responded to the Motion by contending, first, that they did not violate 11 U.S.C. § 362(a)(1) and (a)(3) because they sought *beis din* relief only against the Debtor's principals and not the Debtor. This, however, is incorrect as a matter of law. It is clear from the facts, which in all relevant ways are undisputed, that the issues to be determined by the *beis din* as set forth in the two *hazmonos* pertain to the Debtor's principals' commencement and continued prosecution of the adversary proceeding. Although the *beis din*'s *hazmonos* refer to "all" the claims between the parties, it was acknowledged during oral argument, and the Court finds, that those claims are not, in real terms, claims between those who invoked the *beis din* and the Debtor's principals, but, rather, claims between those who invoked the *beis din* and the Debtor. In other words, it was only because the Debtor's principals directed the Debtor to act as it has in this chapter 11 case that the *beis din* proceeding was invoked against them.
>
> It is equally obvious, therefore, that Bais Chinuch and the individuals' invocation of the *beis din* proceeding – and the issuance of the beis din's purported injunction (*ekul*) – are actually directed at the Debtor with the intention of wresting control of the Debtor's adversary proceeding and exerting pressure to have it dismissed.
>
> Under well-established case law, the fact that, nominally, these actions were against the Debtor's principals therefore is of no legal effect. Because of the principals' identity of interest here with the Debtor, the automatic stay applies to protect them from the beis din.
>
> * * * * *
>
> It is clear, moreover, that the purpose of commencing the beis din proceeding and seeking *ekul* [injunctive] relief was to control the adversary proceeding, an estate asset …

24

Appellant cited no cases on point which support the outlandish proposition that there is somehow a difference in terms of the automatic stay between (i) commencing an arbitration proceeding to enjoin a debtor's officers from prosecuting the debtor's claims in bankruptcy court, and (ii) commencing an arbitration against a debtor for that same relief.  Indeed, in all of the cases that have dealt with the issue, it is only where claims asserted against a debtor's principals were *independent* of any claims between a debtor and the person bringing the claim that the same were held to not be stayed.  Here, there are no such independent claims.[18]

## CONCLUSION

For the reasons set forth above, and in the well-reasoned opinion of the Bankruptcy Court, the Bankruptcy Court's Order (i) holding the Contemnors in contempt for violation of the automatic stay (by commencing a post-petition *beis din* arbitration seeking to adjudicate property claims of the Debtor), (ii) declaring the commencement of those arbitration proceeding void *ab initio*, and (iii) enjoining any arbitration panel from issuing any coercive sanctions intended to compel the Debtor to participate in the enjoined arbitration proceedings, should be affirmed in all respects.

Dated: December 21, 2015

---

[18] See, for example, *Teachers Ins. & Annuity Asso v. Butler*, 803 F.2d 61 (2d Cir. N.Y. 1986) [suit against general partners of debtor limited partnership not stayed because they were individually personally liable on loan agreement]; *Ripley v. Mulroy*, 80 B.R. 17 (Bankr. E.D.N.Y. 1987) [recipient of fraudulently conveyed funds from debtor individually liable to creditor and, therefore, may not benefit from automatic stay as to debtor]; *FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, 2012 Bankr. LEXIS 5906, *1, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) [action for violation of Fair Labor Standards Act against debtor's managers not stayed because the Act created an independent cause of action against managers]; *Gray v. Hirsch (In re Gray)*, 230 B.R. 239 (Bankr. S.D.N.Y. 1999) [fraudulent inducement claim against an individual not stayed because it was independent of any claim against debtor]; and *In re Bidermann Indus. U.S.A.*, 200 B.R. 779 (Bankr. S.D.N.Y. 1996) [defamation claim against president of debtor not stayed because it was independent of breach of contract claim against debtor].

LEVINE & ASSOCIATES, P.C.

By: _____
    Michael Levine

15 Barclay Road
Scarsdale, NY  10583
Telephone (914) 600-4288
Facsimile (914) 725-4778
Cell Phone (917) 855-6453
e-mail: ml@LevLaw.org

*Special Litigation counsel for the Debtor*